## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHARLES L. ADLER, GRANT ADLER, and C. M. ADLER, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>GRUMA CORPORATION D/B/A MISSION FOODS and GUERRERO MEXICAN FOOD PRODUCTS, ETC.,<br><br>Defendant. | Case No. 22-cv-06598-GC-DEA<br><br><br>*Electronically Filed* |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS AND COMPEL ARBITRATION

**LOCKE LORD LLP**

Richard J. Reibstein, Esq.
Christopher B. Fontenelli, Esq.
One Gateway Center
26th Floor, Suite 18
Newark, NJ 07102
(973) 520-2300
rreibstein@lockelord.com
cfontenelli@lockelord.com

*Attorneys for Defendant Gruma Corporation d/b/a Mission Foods and Guerrero Mexican Food Products*

February 13, 2023

# **TABLE OF CONTENTS**

Page

SUMMARY OF MOTION ........................................................................1

FACTS ALLEGED IN THE COMPLAINT ...........................................5

  A.    The Arbitration Provisions In The SDDA. .................................5

  B.    The Choice Of Law Provision In The SDDA And Gruma's Relationship To Texas.......................................................6

  C.    Plaintiffs State In Their Complaint That The SDDA Governs The Distributorship Relationship Between Gruma And All Of The Plaintiffs. ........................................................8

  D.    Plaintiffs Refer To, Are Relying Upon, Are Seeking Relief Under, And Have Benefited From, The SDDA. ...............................9

ARGUMENT ........................................................................................10

  A.    The Governing Law Under The SDDA Including Its Arbitration Clause Is Texas And, If Needed To Uphold The Arbitration Clause, The FAA.........................................................10

  B.    The Arbitration Provisions Broadly Cover All Of The Claims Asserted, As Determined Under Texas Law And The FAA. ...................15

  C.    Arbitration Clauses In A Contract Not Only Cover Signatories But Also Non-Signatories That Rely Upon, Seek Relief Under, Or Have Benefited From The Contract. ...............................20

  D.    In Their Complaint, The Signatory And Two Non-Signatory Plaintiffs Repeatedly Reference, Rely Upon, Seek Relief Based On, And Have Benefited In The Past From, The SDDA Containing A Broad Arbitration Clause. ..........................................23

    1.    All Of Plaintiffs' Wage And Hour, Wage Payment, Wage Notice, And Retaliation Claims Are Based On The Gruma's Rights And Plaintiffs' Obligations Set Forth In The SDDA. ...................23

    2.    Plaintiffs' Franchise Practices Act Claim Requires That They Plead They Had A "Written Arrangement" And That It Was Terminated By Defendant Without Cause. ...............................27

3.    Plaintiffs' Rescission, Unjust Enrichment, And Good Faith And
        Fair Dealing Claims Are Based Upon The SDDA And Likewise
        Seek Relief Under The SDDA..............................................................28

CONCLUSION ..........................................................................................................30

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Arthur Anderson LLP v. Carlisle*,
   556 U.S. 624 (2009)...............................................................20

*Bailey v. Healthsouth Corp.*,
   No. 9:17-CV-57, 2017 WL 664445 (Jan. 26, 2017)
    (Magistrate Report); *recommendation adopted*, 2017 WL 661964
   (E.D. Tex. Feb. 16, 2017) ...................................................22

*Bayonne Drydock & Repair Corp. v. Wartsila N. Am., Inc.*,
   No. 12-cv-819 (CCC), 2013 WL 3286149 (D.N.J. June 28, 2013) .................22

*Bouriez v. Carnegie Mellon Univ.*,
   359 F.3d 292 (3d Cir. 2004) ...............................................20

*Centex/Vestal v. Friendship W. Baptist Church*,
   314 S.W.3d 677 (Tex. App. 2010)........................................17

*Chemetall US Inc. v. Laflamme*,
   No. 16-cv-780 (JLL), 2016 WL 885309 (D.N.J. Mar. 8, 2016)........................15

*Cobalis Corp. v. Cornell Cap. Partners, LP*,
   No. 2:11-CV-04716 (DMC) (JAD), 2011 WL 4962188 (D.N.J.
   Oct. 18, 2011) ...........................................................11

*Coface Collections N. Am. Inc. v. Newton*,
   430 F. App'x 162 (3d Cir. 2011) .......................................14

*Curtis v. Cellco P'ship*,
   413 N.J. Super. 26 (2010) ................................................18

*In re Dillard Dep't Stores, Inc.*,
   186 S.W.3d 514 (Tex. 2006) ....................................16, 17

*E. I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resin
   Intermediaries, S.A.S.*,
   269 F.3d 187 (3d Cir. 2001) ..............................................21

*Emerald Tex., Inc. v. Peel*,
   920 S.W.2d 398 (Tex. App. 1996)......................................................................16

*Epic Sys. Corp. v. Lewis*,
   138 S. Ct. 1612 (2018)......................................................................................17

*Facta Health, Inc. v. Pharmadent, LLC*,
   No. 20-cv-09631 (SRC), 2020 WL 5957619 (D.N.J. Oct. 8, 2020)..................21

*In re FirstMerit Bank, N.A.*,
   52 S.W.3d 749 (Tex. 2001)..............................................................................16

*Griswold v. Coventry First LLC*,
   762 F.3d 264 (3d Cir. 2014) .......................................................................20, 21

*Haskins v. First Am. Title Ins. Co.*,
   866 F. Supp. 2d 343 (D.N.J. 2012)...................................................................20

*Homa v. Am. Express Co.*,
   558 F.3d 225 (3d Cir. 2009) .............................................................................11

*Howmedica Osteonics Corp. v. Howard*,
   No. 19-cv-19254 (EP), 2022 WL 16362464 (D.N.J. Oct. 28, 2022) ...........13, 14

*Instructional Sys., Inc. v. Comput. Curriculum Corp.*,
   130 N.J. 324 (1992) ....................................................................................11, 12

*Invista S.A.R.L. v. Rhodia, S.A.*,
   625 F.3d 75 (3d Cir. 2010) ...............................................................................21

*John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*,
   119 F.3d 1070 (3d Cir. 1997) ...........................................................................18

*Lamps Plus, Inc. v. Varela*,
   139 S. Ct. 1407 (2019)......................................................................................17

*N. Bergen Rex Transp., Inc. v. Trailer Leasing Co.*,
   158 N.J. 561 (1999) .........................................................................................12

*Neal v. Asta Funding, Inc.*,
   No. 13-cv-6981 (KM), 2016 WL 3566960 (D.N.J. June 30, 2016)..................21

*Noble Drilling Servs., Inc. v. Certex USA, Inc.*,
   620 F.3d 469 (5th Cir. 2010) ...............................................................20

*Prudential Sec. Inc. v. Marshall*,
   909 S.W.2d 896 (Tex. 1995) ...........................................................16, 17

*In re Remicade (Direct Purchaser) Antitrust Litig.*,
   938 F.3d 515 (3d Cir. 2019) ...............................................................18

*Rosenberg v. Hotel Connections, Inc.*,
   No. 21-4876 (ZNQ) (TJB), 2022 WL 7534445 (D.N.J. Oct. 13,
   2022) ...........................................................................................14, 15

*Shearson/Am. Exp., Inc. v. McMahon*,
   482 U.S. 220 (1987)........................................................................17

*Specialty Select Care Ctr. of San Antonio v. Juiel*,
   No. 04-14-00514-CV, 2016 WL 3944834 (Tex. App. July 20,
   2016) ...........................................................................................22

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*,
   363 U.S. 574 (1960)........................................................................19

*In re Weekley Homes, L.P.*,
   180 S.W. 3d 127 (Tex. 2005) .............................................................22

## Statutes and Rules

Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*....................................*passim*

Fed. R. Civ. P. 12 ..............................................................................1

New Jersey Franchise Practices Act, N.J.S.A. 56:10-1, *et seq*......................3, 27, 28

Tex. Civ. Prac. & Rem. Code § 171.001 ..................................................16

Tex. Civ. Prac. & Rem. Code § 171.021 ...................................1, 16, 18, 19

Defendant Gruma Corporation d/b/a Mission Foods and Guerrero Mexican Food Products ("Gruma") files this Motion to Dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure and to Compel Arbitration pursuant to the Texas Arbitration Act ("TAA") and Federal Arbitration Act ("FAA").

## SUMMARY OF MOTION

The Complaint alleges that plaintiffs Charles L. Adler, Grant Adler, and C. M. Adler, LLC (collectively, "plaintiffs") are New Jersey-based distributors and franchisees of food products supplied to them by Gruma, a company they confirm in their Complaint as having its principal place of business in Texas. They allege they have been misclassified as independent contractors instead of employees and are franchisees who were improperly terminated.  The Complaint asserts claims under the federal minimum wage and hour law; the New Jersey wage and hour, wage payment, and wage notice laws; the New Jersey franchise practices statute; and New Jersey common law for rescission, unjust enrichment, and breach of the covenant of good faith and fair dealing.  All of those claims are expressly based on the terms of an agreement referred to in the Complaint as the "Store Door Distributor Agreement," also referred to as the "SDDA" – an agreement that the plaintiffs annex as Exhibit A to their Complaint.

The SDDA includes an arbitration clause that forms the basis for this motion to compel arbitration under the laws set forth in the SDDA's choice of law provision,

1

which designates Texas law and the FAA as the laws governing the contract and its arbitration provisions. The language of the arbitration clause is broad and covers all of the disputes set forth in this case under prevailing case law as developed under Texas law and the FAA. Plaintiffs acknowledge in the Complaint that the SDDA contains an arbitration clause, but they assert that the arbitration provision is "not effective" under New Jersey law. However, under federal and state choice of law decisions by courts in this Circuit, the contractual choice of Texas law and the FAA govern the arbitration clause in the SDDA – not New Jersey law.

Paragraph 5 of the Complaint alleges that the SDDA was "between Gruma and its distributors, including the *Plaintiffs*" (emphasis added).  The agreement attached to the Complaint as Exhibit A was signed in the name of the corporate plaintiff, C. M. Adler, LLC, and it is anticipated that the individual plaintiffs will argue that they are not subject to the arbitration provisions therein.  There is, however, abundant case law in this Circuit and under Texas law that authorize the courts to compel arbitration against *non-signatories* as well as signatories to an agreement with an arbitration clause.  The courts have done so readily under the doctrine of estoppel or equitable estoppel whenever non-signatories assert claims based on an agreement containing an arbitration clause or affirmatively rely upon, seek relief under, or have benefited from such an agreement – even though they never signed the contract. As shown by the cases discussed in the Argument section

below, the courts do not confine the estoppel doctrine in the context of a motion to compel arbitration to claims for breach of contract, but they also readily extend the doctrine to claims under statutes and common law, essentially utilizing the principle that a party cannot have its cake and eat it too.

The Complaint has over 60 references to the "Store Door Distributor Agreement," the "SDDA," and the "distribution agreement." It alleges over a dozen times that the SDDA governs *all of the plaintiffs*. The thrust of plaintiffs' wage claims is that numerous provisions of the SDDA impose direction and control upon plaintiffs sufficient to establish that they were misclassified as independent contractors and should instead have been classified as employees – and as employees, they would be covered by the federal and state wage laws under which they seek relief in their Complaint. Plaintiffs not only refer repeatedly to the SDDA in their Complaint, but they rely heavily upon the SDDA to try to establish their claims under these federal and state wage laws. They also seek relief for the alleged "wrongful termination of the SDDA," and acknowledge that they have benefited from the SDDA (albeit not as much as they feel they were entitled).

As to their franchise practices claims, plaintiffs allege that they are all franchisees under the New Jersey Franchise Practices Act, N.J.S.A. 56:10-1, *et seq*. In support of their franchise claim, they again make multiple references throughout their Complaint to the SDDA. The state franchise practices statute they rely upon

expressly applies *only* where there is a "written arrangement." Thus, the SDDA is an essential element of plaintiffs' franchise practices claim. Indeed, plaintiffs ask this Court to reinstate them as franchisees and award them their route back along with "damages incurred as a result of the wrongful termination of the SDDA."

In addition, plaintiffs assert a common law claim for relief for rescission of those "portions" of the SDDA that allegedly violate the wage laws, and they identify as unlawful the contractual provisions that classify plaintiffs as independent contractors. They do not allege, however, that the entire SDDA is subject to rescission or that the arbitration provisions are unenforceable and subject to rescission. Similarly, in their good faith and fair dealing claim as discussed below, plaintiffs allege that defendant "deprive[d] these plaintiffs of their right to receive the benefits *under their distribution agreements*" and "breached the covenant of good faith and fair dealing implied *in every contract* under New Jersey law" (emphasis added).

In sum, there are few if any cases with a set of allegations that more aptly support the application of the doctrine of equitable estoppel in support of a motion to compel arbitration against a signatory and two non-signatories, all of whom refer to, rely upon, seek relief based on, and have benefited from, an agreement that contains a broad arbitration provision that is valid under applicable law and covers all of plaintiffs' claims for relief.

## FACTS ALLEGED IN THE COMPLAINT

**A.    The Arbitration Provisions In The SDDA.[1]**

As noted in the Summary of Motion, the plaintiffs attached the SDDA to the Complaint as Exhibit A.  (References to the SDDA below will be to the page number on the lower left of Exhibit A).  Plaintiffs acknowledge in paragraph 17 of the Complaint that the SDDA, signed in 2014, contains an arbitration clause.  The arbitration provision for claims that are not class action claims is found in Subsection 15 (*i*) (ii) of the SDDA (at page 21 of 33), and sets forth a broad scope of claims subject to arbitration. Subsection 15 (*i*) (ii) states in relevant part:

ii.   Non-Class Claims

*… [A]ny and all …  claims and causes of action arising out of or relating to this Agreement* (including, without limitation, matters relating to this Subsection 15(*i*) regarding arbitration, matters relating to performance, breach, interpretation, meaning, construction, or enforceability of all or any part of this Agreement, *and all claims for rescission or fraud in the inducement of this Agreement) shall be resolved by arbitration through*

---

[1] In moving this Court to compel arbitration, Gruma specifically seeks to dispel any inference that any of plaintiffs' claims have any merit.  The plaintiffs' relationship with Gruma as independent contractors is legally sound and supported by case law. Their claim to have been paid under the minimum wage rate for employees is belied by their income reported to the IRS (*see* footnote 4, *infra*).  And plaintiffs' argument that plaintiffs are franchisees is also erroneous and misplaced.  So, too, are plaintiffs' common law claims.  Nonetheless, defendant understands that the absence of merit to any of plaintiffs' claims is not subject to argument or determination on this motion.

> ***J.A.M.S/Endispute ("JAMS")*** as provided in Subsection
> 15(*i*) (iii) below. [2]

(Emphasis added).  The SDDA then sets forth the contractual JAMS arbitration

procedures in Subsection 15 (*i*) (iv), found at page 22 of 33 of the SDDA, which

states in relevant part:

> iv.  <u>Arbitration Procedures</u>
>
> *All arbitration proceedings, once properly commenced,*
> *shall proceed pursuant to JAMS Streamlined Arbitration*
> *Rules and Procedures ("JAMS Streamlined Rules") or*
> *such other rules as JAMS may then decide are applicable.*
> The parties have deliberately selected the JAMS
> Streamlined Rules because they contemplate a quick,
> inexpensive and binding resolution of their individual
> claims and business disputes while memories are fresh.

 (Emphasis added).

## B.     The Choice Of Law Provision In The SDDA And Gruma's Relationship To Texas.

The SDDA also contains a choice of law provision in Subsection 15 (k),

providing that Texas law governs and the FAA shall also apply to the extent needed:

> k.  <u>Governing law</u>
>
> This Agreement shall be governed by and construed in
> accordance with the laws of the State of Texas. The
> Federal Arbitration Act, 9 U.S.C. § 1 et seq. shall also

---

[2] Subsection 15 (*i*) (iii) addresses "Class Claims." The reference in this Subsection
15 (*i*) (ii) to Subsection 15 (*i*) (iii) is a typo and should have referred to Subsection
15 (*i*) (iv), which addresses arbitration procedures under JAMS.

apply as needed to uphold the validity or enforceability of the arbitration provisions of this Agreement.

Plaintiffs allege in paragraph 18 of the Complaint that defendant has "a principal place of business in the United States, located at 5601 Executive Dr. #800, Irving, Texas 75038." *See also* Complaint ¶ 16 ("Gruma maintains its principal place of business within the State of Texas.").  In support of the SDDA's choice of law provision, Gruma is filing the accompanying Declaration of Ron Anderson ("Anderson Declaration" or "Anderson Decl."), Vice President of Retail Sales for Gruma Corporation, setting forth the basis for Texas being selected as the state law governing the SDDA.  As set forth in the Anderson Declaration, Gruma does indeed maintain its headquarters at that same address in Irving, Texas, and, in addition to Texas being the state where the company's business affairs in the United States are centered, especially as it relates to independent distributors like C. M. Adler, LLC. Texas is the state where Gruma:

- developed its policy and practice of designating distributors as independent contractors;

- coordinates and carries out the process of drafting and enforcing SDDAs with independent distributors, including the drafting and sending of notices to such distributors;

- coordinates the purchase and distribution of its products by independent distributors;

- employs its senior leadership staff, finance employees, and its senior operation employees, and manages those employees that interact with independent distributors throughout the U.S.;

- creates and maintains customer relationships with customers to which independent distributors distribute its products;

- determines prices for its products purchased by independent distributors;

- employs its technical team that assists with issues related to the independent distributors' use of their own or Gruma's handheld computers, which facilitate the processing of product orders, purchases, and sales;

- coordinates logistical efforts for utilizing third-party carriers that are responsible for delivering product to the warehouses of independent distributors (like plaintiff C. M. Adler, LLC) that utilize their own warehouses; and

- remits payment to independent distributors including plaintiff C. M. Adler on a weekly basis for their sales less agreed upon fees, and sends yearly Form 1099s to such distributors.

**C.     Plaintiffs State In Their Complaint That The SDDA Governs The Distributorship Relationship Between Gruma And All Of The Plaintiffs.**

The SDDA attached as Exhibit A to the Complaint is signed only by one of the plaintiffs, C. M. Adler LLC.  (*See* page 24 of 33 of the SDDA, where it was signed by Mary Adler as the "CFO" for C. M. Adler, LLC).   Page 1 of the SDDA, attached as Exhibit A to the Complaint, states that it was "made and entered into effective as of 3/7/14 . . .."   There are abundant references by the plaintiffs throughout their Complaint that the SDDA governs *all of the plaintiffs*.  *See* Complaint ¶¶ 5, 20, 38, 39, 43, 48, 49, 52, 58 (h), 58 (p), 133, 163, 176, 177, 179, 190.  For example, paragraphs 38 and 39 of the Complaint provide as follows:

38.  Notably, the SDDA provided plaintiffs with a license to use defendant's "Marks" or trademarks and brand names, as well as to sell defendant's products and to use other proprietary rights of the defendant as set forth in the SDDA. SDDA Sections 1(k), (m), (n), *etc.*

39.  The SDDA also required that the plaintiffs "shall keep and maintain adequate warehouse facilities for any inventories of Products Distributor may have on hand from time to time" and directed that the warehouse be maintained "in clean and sanitary conditions and in full compliance with all applicable health, safety and other laws or regulations." SDDA Section 8(c).

(Emphasis added).  Further, in paragraph 25 of the Complaint, plaintiffs allege that

Charles L. Adler "signed a Store Door Distributor Agreement dated March 7, 2014

with Gruma."

## D.   Plaintiffs Refer To, Are Relying Upon, Are Seeking Relief Under, And Have Benefited From, The SDDA.

There are over 60 direct references throughout the Complaint to the words

"SDDA," "Store Door Distributor Agreement," "Store Door Distribution

Agreement," and "distribution agreement."[3]   In addition, there are many indirect

references to the SDDA in the Complaint.  Section "D" of the "Argument" addresses

many of those direct and indirect references to the SDDA as well as the manner in

which all of the plaintiffs rely, in whole or in large part, upon the existence of the

SDDA itself, or to specific provisions in the SDDA, to support virtually all of their

---

[3] The SDDA is entitled "Store Door *Distributor* Agreement" but the Complaint also refers to it as the "Store Door *Distribution* Agreement."  *Compare, e.g.,* Complaint ¶ 5 *with* Complaint ¶ 25.

claims.  We also address below that plaintiffs are seeking relief under the SDDA (including for wrongful termination of the SDDA).  Finally, we address below the fact that plaintiffs acknowledge in the Complaint that they benefited from the SDDA prior to its termination by Gruma – indeed, the average yearly compensation they received from Gruma for sales of food products pursuant to their distribution rights under the SDDA exceeded *$103,000 per year* over their last six years working under the SDDA.[4]

## ARGUMENT

### A.    The Governing Law Under The SDDA Including Its Arbitration Clause Is Texas And, If Needed To Uphold The Arbitration Clause, The FAA.

As noted in Section "B" of the "Facts Alleged in the Complaint," the SDDA provides in Subsection 15 (k) that "This agreement shall be governed by and construed in accordance with the laws of the State of Texas." It further provides in

---

[4] Plaintiffs state in the Complaint that the SDDA granted them "a license to … sell defendant Gruma's products" (*see* Complaint ¶ 27) and, as a result, they received "earnings from product sales" (*id.* ¶¶ 84, 106, 125).  While plaintiffs repeatedly assert that they only received "*minimal* earnings on product sales," (*see id.* (emphasis added)), they actually received from Gruma ***$103,892.84 per year*** on average over each of the last 6 full calendar years prior to Gruma's termination of the SDDA, based on the Forms 1099 sent from Gruma's Texas offices to C M Adler. *See* Anderson Decl. ¶ 12 and Exhibit A attached thereto (Forms 1099 issued to C M Adler LLC by Gruma for 2016 through 2021). Separate and apart from plaintiffs' drastically mischaracterizing their profits by telling this Court their earnings on product sales was "minimal," plaintiffs' hourly rate, even based on the hours they allege they worked each week, calculates to over three times the federal minimum wage rate and two times the New Jersey minimum wage rate.

that subsection that "The Federal Arbitration Act, 9 U.S.C. § 1 et seq. shall also apply as needed to uphold the validity or enforceability of the arbitration provisions of this Agreement."  Plaintiffs acknowledge in paragraph 17 of the Complaint that "the parties' SDDA purports to contain an arbitration provision," but "the arbitration provision in the SDDA is not effective and therefore not binding pursuant to the laws of the State of New Jersey."  However, as shown below, the arbitration provisions in the SDDA are not governed by New Jersey law but rather Texas law.

The general rule in the federal courts when applying a contractual choice-of-law clause is to apply the choice of law rules of the forum state.  *See Homa v. Am. Express Co.*, 558 F.3d 225, 227 (3d Cir. 2009).  The New Jersey Supreme Court uses the Restatement (Second) Conflict of Laws, Section 187 (1969), as guidance in construing its own choice of law rules when dealing with a contractual choice of law provision.  *Instructional Sys., Inc. v. Comput. Curriculum Corp.,* 130 N.J. 324, 341–42 (1992).  *See also Cobalis Corp. v. Cornell Cap. Partners, LP,* No. 2:11-CV-04716 (DMC) (JAD), 2011 WL 4962188, at *6 (D.N.J. Oct. 18, 2011).

As noted by the New Jersey Supreme Court in the above-cited *Instructional Systems* case, the Restatement (Second) provides in Section 187 that the law of the state chosen by the parties has effect and will apply *unless one of two exceptions are applicable*:  "(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice" or "(b)

application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties."  130 N.J. at 341–42.  *As shown below, neither of those two exceptions are applicable here, thus Texas law, the state chosen by the parties, applies.*

It is a given that the first exception of Section 187 of the Restatement (Second) is inapplicable because Texas has a substantial relationship to the parties or the transaction.  As noted in Section "B" of the "Facts Alleged in the Complaint," plaintiffs acknowledge that Gruma has its principal place of business in Irving, Texas and the accompanying Declaration of Gruma's Vice-President of Retail Sales confirms that Irving, Texas is the headquarters of defendant.  *See* Anderson Decl. ¶ 2.  A party's principal place of business in the state is alone sufficient to establish under New Jersey law that there is a "substantial relationship" to such state, even without all of the other contacts with Texas that are set forth in the aforesaid Declaration.  *Instructional Sys., Inc.*, 130 N.J.  at 342 (defendant "is headquartered in California, and hence California has a 'substantial relationship to the parties.'").  *See also N. Bergen Rex Transp., Inc. v. Trailer Leasing Co.,* 158 N.J. 561, 569 (1999) ("headquarters" in a state satisfies the "substantial relationship" test).  Accordingly,

the law of Texas applies to the SDDA including its arbitration provisions *unless* the second exception is applicable – and as shown below, it is not.

The second exception to Section 187 of the Restatement (Second) is only established if all three of its elements are met. *See Howmedica Osteonics Corp. v. Howard,* No. 19-cv-19254 (EP), 2022 WL 16362464, at *6, (D.N.J. Oct. 28, 2022). The first element is that the forum state must have a "materially greater interest" than the chosen state in the determination of the particular issue. If and only if that element is established, then the second element that must be shown is that the "application of the law of the chosen state would be contrary to a fundamental policy" of the forum state. If that second element is met, then the third and final element is that absent a valid and enforceable choice of law clause, the forum state's law would apply. *Id.* It is a given that there is no reason for the courts to examine the second or third element if the first does not apply. *Id.*, at *8.

Courts in this district have concluded that when two states both have a substantial interest in a matter, "geographic ties" related to one state do not create a materially greater interest than a party's principal place of business in the other state. *Id.*, at *7. In *Howmedica*, the individual parties lived in California; they worked primarily worked in California; and the alleged wrongful actions occurred in California. In contrast, the corporate party was at least partially based in New Jersey; its senior leadership team was at least partially based in New Jersey; some of its

research and development, finance, and operations employees were based in New Jersey; and some of its equipment and inventory was shipped to the company's sales force from New Jersey. The *Howmedica* court concluded that both California and New Jersey each had a substantial interest in enforcing the rights of the parties but that neither had a "materially greater interest" than the other. *Id.*, at *7. *See also Coface Collections N. Am. Inc. v. Newton*, 430 F. App'x 162, 168 (3d Cir. 2011) ("geographical contacts do not support the conclusion that [the state where one party resides and works and where he signed the contract] has a 'materially greater interest'" than a state where the other party is incorporated and does business.).

In *Rosenberg v. Hotel Connections, Inc.*, No. 21-4876 (ZNQ) (TJB), 2022 WL 7534445, at *3–5, (D.N.J. Oct. 13, 2022), the district court judge held that New Jersey, the state where a party negotiated and signed an employment contract, lives, worked, and brought an action under New Jersey state laws, does not have a materially greater interest in the dispute than does New York, the state selected by the parties as the choice of law, when the other party was incorporated in New York at the time the parties executed the contract (even though it was no longer incorporated in that state at the time the lawsuit was brought). As the court stated: "There is no question that New Jersey has a substantial relationship to this dispute and a material interest in enforcing a New Jersey resident-plaintiff's rights in an employment contract. Nevertheless, New Jersey does not have a *materially greater*

interest than New York in this dispute." *Id.* (emphasis in original).  In such circumstances, the decision concludes, "the Court need not reach the second and third elements [of Section 187 of the Restatement (Second)]".  *Id.*, at *5.  *See also Chemetall US Inc. v. Laflamme*, No. 16-cv-780 (JLL), 2016 WL 885309, at *6–8 (D.N.J. Mar. 8, 2016) (a party's residence, working in, servicing his customers, and executing the contract in a state does not mean such state has a materially greater interest than the state where the other party is headquartered).

In conclusion, under court decisions in this Circuit, the law of the state that was selected as the parties' choice of law in the SDDA – Texas law – governs the enforcement of the SDDA's arbitration provision, and the SDDA further provides that the FAA can also be used if needed to enforce the arbitration provisions. In accordance with the cases noted above, New Jersey law does not impact the enforcement of the arbitration provisions in the SDDA, contrary to plaintiffs' assertion in paragraph 17 of the Complaint.

**B.     The Arbitration Provisions Broadly Cover All Of The Claims Asserted, As Determined Under Texas Law And The FAA.**

As noted above, the SDDA contains an arbitration clause that covers "any and all . . . claims and causes of action arising out of or relating to this Agreement."  As shown below, such language is regarded under Texas law and the FAA as expansive and would encompass every one of the claims for relief asserted in the Complaint.

1. **The Language Of The Arbitration Clause Is Regarded As Broad Under The Texas Arbitration Act.**

Under the TAA, to enforce an arbitration provision, a party must establish only that (1) an arbitration agreement exists and (2) the asserted claims fall within the scope of that agreement. *See In re Dillard Dep't Stores, Inc.*, 186 S.W.3d 514, 515 (Tex. 2006) (holding that parties were bound to arbitration because the arbitration agreement was valid and enforceable and plaintiff's claims fell within its scope); *see also* TEX. CIV. PRAC. REM. CODE § 171.021. Critically, if a court finds that a plaintiff's claims fall within the scope of a valid arbitration agreement, the "court has no discretion but to compel arbitration . . .." *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 753–54 (Tex. 2001).

Under the TAA, a "written agreement to arbitrate is valid and enforceable if the agreement is to arbitrate a controversy that: (1) exists at the time of the agreement; or (2) arises between the parties after the date of the agreement." TEX. CIV. PRAC. & REM. CODE § 171.001. The TAA demands a strong presumption in favor of finding a valid and enforceable agreement. *See Emerald Tex., Inc. v. Peel*, 920 S.W.2d 398, 402 (Tex. App. 1996).

In determining whether the asserted claims fall within the scope of a valid arbitration agreement, Texas courts resolve any doubts about the agreement to arbitrate in favor of arbitration. *See Prudential Sec. Inc. v. Marshall*, 909 S.W.2d 896, 899 (Tex. 1995). Here, the pertinent language of the arbitration agreement is

that it covers "any and all other claims and causes of action *arising out of or relating to* this Agreement." (Emphasis added). Under Texas law, where an arbitration agreement employs language such as "any claim arising out of or related to the Contract," such language is "construed as evidencing the parties' intent to be inclusive rather than exclusive." *Centex/Vestal v. Friendship W. Baptist Church*, 314 S.W.3d 677, 685–86 (Tex. App. 2010). In such cases, arbitration should be compelled absent some "positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue.'" *In re Dillard Dep't Stores,* 186 S.W.3d at 516 (Tex. 2006) (quoting *Prudential Sec. Inc.,* 909 S.W.2d at 899).

## 2. The Arbitration Clause Language Is Also Regarded As Broad Under The FAA.

The FAA also has established a strong policy in favor of arbitration. *See Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018); *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 224 (1987). The FAA "requires rigorous enforcement of arbitration agreements" and "mandates enforcement of applicable arbitration agreements even for federal statutory claims." *McMahon*, 482 U.S. at 226. The Supreme Court recently reiterated its directive to enforce arbitration agreements. *See Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1415 (2019).

The Third Circuit has stated that "the terms 'arising out of' or 'relating to' [in] a contract [is] indicative of an 'extremely broad' agreement to arbitrate any dispute

relating in any way to the contract." *In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d 515, 523 (3d Cir. 2019) (quoting *Curtis v. Cellco P'ship*, 413 N.J. Super. 26, 37–38 (2010)).  In compelling arbitration of federal antitrust claims, the Third Circuit in *Remicade* found that such claims "relate to" the parties' agreement establishing a commercial relationship between the parties including the setting of drug prices, noting: "Such broad clauses have been construed to require arbitration of any dispute between the contracting parties that is connected in any way to their contract."  938 F.3d at 523.  The Third Circuit added that a claim only needs to have "some 'logical or causal connection' to the agreement to be related to it."  *Id.* at 524 (quoting *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1074 (3d Cir. 1997)).

### 3. *Application Of The TAA And FAA Mandate Arbitration Of All Claims For Relief.*

The case authority cited above under the TAA and FAA uniformly demands the same result – that all of plaintiffs' claims are all subject to arbitration.  As shown in the foregoing discussion of the law under the TAA and FAA, it is indisputable that an arbitration agreement exists and that it is valid and enforceable.  While plaintiffs assert that the arbitration clause is not effective under New Jersey law, we have shown above that New Jersey law does *not* apply to the SDDA because, under the Section 187(2) of the Restatement (Second), Conflict of Laws and applicable case law, this state does not have a materially greater interest in this litigation than

does Texas.  Accordingly, pursuant to the SDDA, Texas law applies (along with the FAA to the extent needed for enforcement of the arbitration clause).

All of the asserted claims in the Complaint fall well within the extremely broad scope of the arbitration clause, which covers "any and all other claims and causes of action *arising out of or relating to this Agreement* (including, without limitation, matters relating to this Subsection 15(i) regarding arbitration, matters relating to performance, breach, interpretation, meaning, construction, or enforceability of all or any part of this Agreement, and all claims for rescission or fraud in the inducement of this Agreement) . . .." (emphasis added).  Every one of the causes of action "arise out of" or in some manner "relate to" the store door distributorship relationship that is the subject of the SDDA.  Indeed, as plaintiffs allege in paragraphs 5 and 34 of the Complaint, the signing of an SDDA was a condition for them to establish an alleged employment and franchise relationship with Gruma.  As the cases explain, courts should compel arbitration absent "positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83 (1960).  Accordingly, under the TAA and FAA, this Court should issue an order compelling arbitration of each of the claims for relief asserted.  And for the reasons set forth in the following section of the "Argument," the order compelling arbitration should not only cover the party (C M Adler, LLC)

19

whose name appears on the SDDA annexed to the Complaint as Exhibit A, but also

compel arbitration of all of the claims by each of the two Adler individual plaintiffs,

even though they did not sign the aforesaid SDDA.

**C.  Arbitration Clauses In A Contract Not Only Cover Signatories But Also Non-Signatories That Rely Upon, Seek Relief Under, Or Have Benefited From The Contract.**

Non-signatories may be bound to an arbitration clause under prevailing court

decisions in this Circuit.  As the Third Circuit held in *Griswold v. Coventry First*

*LLC*, 762 F.3d 264 (3d Cir. 2014) (quoting *Arthur Anderson LLP v. Carlisle*, 556

U.S. 624, 631 (2009)), "a non-signatory may be bound by an arbitration agreement

if 'traditional principles' of state law allow a contract to be enforced by or against

nonparties to the contract."  *Griswold,* 762 F.3d at 271.  The court noted in *Griswold*:

> . . . [A] non-signatory may be bound by an arbitration clause if it "embraces the agreement and directly benefits from it." *Bouriez v. Carnegie Mellon Univ.,* 359 F.3d 292, 295 (3d Cir. 2004). "A non-signatory can 'embrace' a contract in two ways: (1) by knowingly *seeking and obtaining direct benefits from that contract*; or (2) by seeking to enforce terms of that contract or *asserting claims [based on the contract's other provisions]*." *Haskins v. First Am. Title Ins. Co.*, 866 F. Supp. 2d 343, 350 (D.N.J. 2012) (quoting *Noble Drilling Services, Inc. v. Certex USA, Inc.*, 620 F.3d 469, 473 (5th Cir. 2010).

*Griswold,* 762 F.3d at 272 (emphasis added).  As shown below, plaintiffs not only

are "asserting claims" based on the SDDA itself and many of its provisions, but they

are "seeking benefits" in the form of relief under the SDDA in their Complaint,

including damages for what they allege to be a wrongful termination of the SDDA, and have directly benefited for years from the SDDA.

The estoppel doctrine recognized in *Griswold* is based on the equitable principle that "prevents a non-signatory from 'cherry-picking' the provisions of a contract that it will benefit from and ignoring other provisions that don't benefit it or that it would prefer not to be governed by (such as an arbitration clause)." *Id*. at 273 (quoting *Invista S.A.R.L. v. Rhodia, S.A.*, 625 F.3d 75, 85 (3d Cir. 2010)). "A non-signatory cannot knowingly embrace the contract only to later 'turn its back' on other provisions in the contract, such as an arbitration clause." *Griswold,* 762 F.3d at 273 (quoting *E. I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediaries, S.A.S.*, 269 F.3d 187, 199 (3d Cir. 2001)).

The district courts in New Jersey have applied the estoppel doctrine outlined in *Griswold* in a number of cases. *See, e.g.*, *Facta Health, Inc. v. Pharmadent, LLC*, No. 20-cv-09631 (SRC), 2020 WL 5957619, at *3 (D.N.J. Oct. 8, 2020) ("where a non-signatory directly benefits from an agreement that includes an arbitration provision, by asserting claims that rely on said agreement as a basis for those claims, the non-signatory is then equitably estopped from claiming that he is not bound by the arbitration clause in the contract."); *Neal v. Asta Funding, Inc.*, No. 13-cv-6981 (KM), 2016 WL 3566960, at *17 (D.N.J. June 30, 2016) (a non-signatory can be bound to an arbitration clause by "seeking to enforce terms of the contract or

asserting claims" based on the contract and by benefiting directly from the contract by obtaining work under the agreement); *Bayonne Drydock & Repair Corp. v. Wartsila N. Am., Inc.,* No. 12-cv-819 (CCC), 2013 WL 3286149, at *6 (D.N.J. June 28, 2013) (a non-signatory cannot seek to avoid an arbitration provision in an agreement when it directly benefited from the agreement; here, absent the agreement, the non-signatory would not have been able to have performed the work).

Texas courts likewise have recognized that non-signatories may be compelled to arbitrate under an agreement containing an arbitration clause under the estoppel doctrine.  Texas courts refer to this doctrine as "direct benefits" estoppel where "a nonparty cannot both have his contract and defeat it too."  *See, e.g., In re Weekley Homes, L.P.*, 180 S.W. 3d 127, 135 (Tex. 2005) (plaintiff that received benefits under an agreement cannot avoid the arbitration provisions of the agreement based on argument that she did not sign agreement); *Specialty Select Care Ctr. of San Antonio v. Juiel*, No. 04-14-00514-CV, 2016 WL 3944834, at *4–5 (Tex. App. July 20, 2016) (non-signatory bound to arbitration provision in agreement where she pursues a claim based on the contract or obtained benefits from the contract itself); *Bailey v. Healthsouth Corp.*,  No. 9:17-CV-57, 2017 WL 664445, at *5–7 (Jan. 26, 2017) (Magistrate Report); *recommendation adopted*, 2017 WL 661964 (E.D. Tex. Feb. 16, 2017) ("direct benefits estoppel" applicable where non-signatory obtained benefits under contract prior to the lawsuit; claims in lawsuit are subject to

arbitration even if not direct claims under the contract but may include common law claims based on negligence).

**D.     In Their Complaint, The Signatory And Two Non-Signatory Plaintiffs Repeatedly Reference, Rely Upon, Seek Relief Based On, And Have Benefited In The Past From, The SDDA Containing A Broad Arbitration Clause.**

### 1.     *All Of Plaintiffs' Wage And Hour, Wage Payment, Wage Notice, And Retaliation Claims Are Based On The Gruma's Rights And Plaintiffs' Obligations Set Forth In The SDDA.*

The Complaint alleges in paragraph 20 that "plaintiffs … are designated as so-called 'independent contractors' under the parties' SDDA," and further alleges in paragraph 21 that "[i]n so doing, Gruma has misclassified plaintiffs as 'independent contractors,' rather than 'employees.'"   Paragraph 21 continues: "And, as such, Gruma has . . . deprived plaintiffs of all of the benefits, privileges and protections available to employees . . . [and] avoided meeting their statutory and common law duties, as 'employers,' to plaintiffs, as 'employees,' including statutory wage and hour provisions . . .."   Paragraph 23 of the Complaint adds:  "All the while – and as more fully detailed in the pages that follow – Gruma has exercised a high degree of control and oversight of plaintiffs' activities, such that the use of the term 'independent contractors' in the SDDA is absolutely meaningless and not representative of the actual relationship between the parties. In fact, the reality is just the opposite."

The lengthy and detailed Complaint thereafter devotes over six full pages of allegations relating to the SDDA in two sections: the first entitled "The SDDA Agreement and the Realities of the Employer-Employee Relationship Between Defendant and Plaintiffs," and the second entitled "The Misclassification of Plaintiffs as 'Independent Contractors' – and the Many Indicia of the True Employer-Employee Relationship." *See* Complaint ¶¶ 44–60. Each of plaintiffs' first nine causes of action are brought under the federal Fair Labor Standards Act ("FLSA") and various New Jersey wage statutes; it is a given that such statutes only protect workers who are "employees" and not independent contractors. Plaintiffs refer repeatedly to the SDDA in paragraphs 48 through 52, 56 and 57, and in the 12 subparagraphs of paragraph 58 of the Complaint.[5]  All such references seek to support their allegation that Gruma directs and controls the plaintiffs and obligates them to work in a manner that they assert is consistent with "employee" status instead of an independent contractor relationship.  The large number of direct and indirect references to the SDDA in the Complaint overwhelmingly demonstrate that

---

[5] Plaintiffs make direct references to the SDDA in subparagraphs 58(b), (h), (p), and (q).  In subparagraphs 58(e), (f), (g), (i), (k), (*l*), (r) and (s), plaintiffs make indirect references to the SDDA by alleging that Gruma retains or has the right to approve, disapprove, require, prohibit, or limit the activities of plaintiffs. Other paragraphs throughout the Complaint likewise focus on provisions in the SDDA that purportedly give Gruma the right to direct and control the performance of plaintiffs and, as such, are alleged to be further indicia of an employer-employee relationship. *See, e.g.,* Complaint ¶¶ 37, 39, 48–49, 51, 52, 133.

plaintiffs are basing their claims under federal and state wage laws on numerous provisions contained in the SDDA, and thus cannot turn their back on its arbitration clause.[6]

To the extent the case law also authorizes courts to apply the estoppel doctrine where a non-signatory has received benefits under an agreement containing an arbitration clause, plaintiffs readily acknowledge in the Complaint (in connection with Counts I, III, and V) that they received "earnings" from product sales (Complaint ¶¶ 84, 106, 125) authorized under the SDDA (*id.* ¶ 27). *See also* footnote 4, *supra*.

Counts VIII and IX of the Complaint (*see id.* ¶¶ 145–54) allege retaliation by Gruma against all of the plaintiffs for "terminating plaintiffs" under two of the federal and state wage laws specified in Counts I through VII (*see id.* 79–144).

---

[6] Not only do plaintiffs allege that Gruma misclassified the plaintiffs as independent contractors by directing and controlling the plaintiffs' work by means of the provisions in the SDDA, plaintiffs also seek relief for "improper deductions and withholdings from wages" (Count III) based on the provisions in the SDDA. They allege as follows: "As discussed *supra*, defendant also willfully and impermissibly required plaintiffs to pay for insurance, equipment, product, fees, technology, and other business expenses and costs that were incurred for the direct benefit of defendant and the Gruma enterprise." *See* Complaint ¶ 106. Plaintiffs' reference to "*supra*" includes, *inter alia*, the allegations in paragraph 52 of the Complaint that "the SDDA mandates that the plaintiffs purchase and supply their own delivery trucks, insurance, and requires that the plaintiffs use exclusively the defendant's hand-held devices . . .." Plaintiffs' Count V for "failure to reimburse expenses" has similar allegations based on the provisions of the SDDA that requires distributors to pay for their own expenses. *See, e.g., id.* ¶ 123.

Plaintiffs allege they were retaliated against by Gruma when it "terminated plaintiffs and otherwise took adverse employment actions, including but not limited to by terminating plaintiffs." *See* Complaint ¶¶ 149, 153. As the Complaint further alleges, Plaintiffs' retaliation allegations are based on Gruma's termination of the SDDA contract. *See id.* ¶ 67. In asserting their retaliation claims, plaintiffs expressly incorporate all of the prior paragraphs' allegations "as if more fully set forth herein." *Id.* ¶¶ 145, 151. In addition to incorporating dozens of Complaint allegations that they were involved in a "true" employer-employee relationship, they also incorporated their allegations that Gruma wrongfully terminated the SDDA. *See id.* ¶¶ 8, 67, 72, along with the SDDA termination letter that plaintiffs referenced in paragraph 72 of the Complaint and attached thereto as Ex. B.

To remedy their allegation that the allegedly retaliatory termination of the SDDA violated federal and state wage laws, they rely further upon the SDDA when they seek "actual damages incurred as a result of defendant's *wrongful termination of the SDDA*." *See* item "g" (emphasis added) in the "Relief Requested" section of the Complaint.[7] By relying upon the SDDA, the plaintiffs, even the two non-signatories, are also subject to the arbitration clause found therein.

---

[7] There are two item (g)'s in the "Relief Requested" on page 45 of the Complaint. The one seeking damages for alleged wrongful termination of the SDDA is the first of the two item (g)'s.

> **2.      Plaintiffs' Franchise Practices Act Claim Requires That They Plead They Had A "Written Arrangement" And That It Was Terminated By Defendant Without Cause.**

Paragraphs 34 to 44 and paragraphs 174 to 193 of the Complaint address plaintiffs' claims in Count XIII of the Complaint for "Violations of New Jersey Franchise Practices Act (N.J.S.A. § 56:10-1 *et seq*.)."  Plaintiffs allege that "the SDDA provided plaintiffs with a license to use defendant's 'Marks' or trademarks and brand names, as well as to sell defendant's products and use other proprietary rights of the defendant as set forth in the SDDA."  *See* Complaint ¶ 38.  *See also id.* ¶¶ 176–177.  Plaintiffs allege that "the plaintiffs' purchase of the distributorship route constituted the purchase of a 'franchise' within the meaning of the … New Jersey Franchise Practices Act . . .."  *Id.* ¶ 183.  They further allege that Gruma "elected to terminate the SDDA 'without cause' (*see id.* ¶ 67 and Exhibit B annexed to the Complaint), which plaintiffs assert is a violation of the New Jersey Franchise Practices Act *(see id.* ¶ 182).

Plaintiffs' reliance on the SDDA is an essential element of a Franchise Practices Act claim, inasmuch as the definition of a "franchise" under the Act "means a *written arrangement* . . . in which a person grants to another person a license to use a trade name, trade mark, service mark, or related characteristics . . .." N.J.S.A. § 56:10-3.a (emphasis added). Thus, this claim for relief is wholly dependent upon the existence of the SDDA and Gruma's election to terminate the

SDDA.[8] In addition, plaintiffs ask this Court to reinstate them as franchisees and award their route back, which was conveyed to them under the terms of the SDDA. *See* Complaint ¶ 193.

### 3. Plaintiffs' Rescission, Unjust Enrichment, And Good Faith And Fair Dealing Claims Are Based Upon The SDDA And Likewise Seek Relief Under The SDDA.

Count X of the Complaint seeking "Rescission" specifically references the SDDA on five occasions.  It alleges in paragraph 157 that to the extent the SDDA classifies plaintiffs as independent contractors, it is "improper and inaccurate."  *See also Id.* ¶ 160 (alleging the classification of distributors as independent contractors is an "unlawful business practice."). Paragraph 163 of the Complaint specifically seeks to rescind "*those portions* [of the SDDA] that violate law" (emphasis added). Plaintiffs do not seek rescission of the entire SDDA or the arbitration provisions in the SDDA, only those provisions that they claim to violate law.  Indeed, as noted earlier, in item "g" of the "Relief Requested," plaintiffs seek damages for "defendant's *wrongful termination* of the SDDA" which includes an arbitration agreement that, by its terms, specifically covers in Subsection 15(*i*) (ii) "all claims for rescission."

---

[8]   The Franchise Practices Act in any event does not apply to plaintiffs, but that is not a matter for this motion.

Count XI of the Complaint for "Unjust Enrichment" is based on "defendant's conduct in misclassifying plaintiffs as independent contractors," which as noted in Count X seeking rescission, is based in large measure on those "portions" of the SDDA that classified distributors as independent contractors and allegedly directed and controlled plaintiffs, as noted above.

Count XIV of the Complaint for "Breach of the Covenant of Good Faith and Fair Dealing" seeks relief based on the actions by defendant that allegedly "deprive[d] these plaintiffs of their right to receive the benefits *under their distribution agreements*." Complaint ¶ 195 (emphasis added). *See also id.* ¶ 197 (Gruma "depriv[ed] plaintiffs of the benefits of the contract to which they were entitled."). In addition, plaintiffs claim that Gruma breached "the covenant of good faith and fair dealing implied in every *contract* under New Jersey law." *Id.* Plaintiffs also seek damages against defendant "for its breaches of the covenant of good faith and fair dealing" implicit in the SDDA. This claim, therefore, effectively seeks to enforce the SDDA, which includes an arbitration provision covering all of their disputes.

In sum, plaintiffs' wage claims, retaliation claims, franchise claims, and common law claims all rely upon the SDDA. In addition, the franchise claims are dependent upon the SDDA. And the retaliation and common law claims seek relief premised on the SDDA. Finally, plaintiffs have benefitted from the SDDA's having

"received earnings on product sales" as a result of the license in the SDDA to sell Gruma's products (*see* footnote 4). As a result, the non-signatory plaintiffs are equally bound to the arbitration provisions in the SDDA as is the signatory plaintiff.

## CONCLUSION

Gruma has established that a valid arbitration agreement (which plaintiffs attached to their Complaint) exists under Texas law and under the FAA, which are the applicable laws governing the arbitration provisions; that the arbitration provisions are broad and cover all of the claims for relief in the plaintiffs' Complaint; and that the two non-signatory plaintiffs are equitably estopped from asserting that they are not covered by the arbitration provisions in the pertinent agreement because they rely upon, seek relief under, and have obtained benefits for years under such agreement containing the arbitration provisions.  For these reasons, we respectfully request that the Court compel each of the plaintiffs to arbitrate all of the claims in their Complaint in accordance with the arbitration provisions set forth in the underlying agreement and dismiss the Complaint.

Dated:  February 13, 2023

LOCKE LORD LLP

By:   */s/ Richard J. Reibstein*
Richard J. Reibstein, Esq.
Christopher B. Fontenelli, Esq.
One Gateway Center
26th Floor, Suite 18
Newark, NJ 07102
(973) 520-2300
rreibstein@lockelord.com
cfontenelli@lockelord.com

*Attorneys for Defendant Gruma Corporation*
*d/b/a Mission Foods and Guerrero Mexican*
*Food Products*